## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| RYDER TRUCK RENTAL, INC., a Florida Corporation, d/b/a Ryder Transportation Services, d/b/a Ryder/Jacobs, d/b/a Ryder Atlas of Western Michigan, | Civil Action No. _____ |
| Plaintiff, | |
| vs. | COMPLAINT |
| EATON CORPORATION plc, f/k/a EATON CORPORATION, | JURY TRIAL DEMANDED |
| Defendant. | |

### COMPLAINT FOR DAMAGES AND PERMANENT INJUNCTIVE RELIEF

Plaintiff, Ryder Truck Rental, Inc., by and through its undersigned attorneys, brings this action under the antitrust laws of the United States for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, and Chapter 501, Fla. Stat. This Complaint arises from Defendant's illegal and anticompetitive conduct in connection with the market for transmissions in heavy duty trucks.

The allegations herein are made on information and belief and based on investigation and review of public filings, court rulings, and jury findings of fact in the public record.

### I.   NATURE OF THE CLAIM

1.   Plaintiff Ryder Truck Rentals, Inc. ("Ryder") brings this action following the successful private enforcement of the federal antitrust laws against the dominant player in the manufacture and sale of Class 8 (heavy duty) truck transmissions (respectively, "HD Trucks" and "HD Transmissions"). In 2014, Eaton Corporation (now Eaton Corporation plc) ("Eaton") paid $500 million to settle antitrust claims brought by ZF Meritor LLC, Eaton's only viable competitor

in the HD Transmission market. This extraordinary settlement followed a trial verdict on liability, in which a jury found that Eaton destroyed ZF Meritor, a new entrant to the market and Eaton's only viable competitor, in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. (A copy of the verdict form is attached as Ex. A). The United States Court of Appeals for the Third Circuit affirmed the jury verdict, holding that "there was sufficient evidence in the record to establish that Eaton engaged in anticompetitive conduct—specifically that Eaton entered into long-term de facto exclusive dealing arrangements—which foreclosed a substantial share of the market and, as a result, harmed competition." *ZF Meritor LLC v. Eaton Corp.*, 696 F.3d 254, 263 (3d Cir. 2012).

2.      The HD Truck and HD Transmission consumer in this action is Plaintiff Ryder, a Florida corporation and a subsidiary of Ryder System, Inc. ("Ryder System"), a global leader in transportation and supply chain management solutions that is headquartered in Miami, Florida. To serve its customers, Ryder owns or manages hundreds of thousands of vehicles at any point in time (currently at 231,000), including thousands of Class 8 linehaul trucks (commonly referred to as 18 wheelers). During the Affected Period (defined below) Ryder purchased tens of thousands Class 8 linehaul trucks ("HD Linehaul Trucks") equipped with Eaton Class 8 linehaul transmissions ("Eaton Linehaul Transmissions").

3.      Defendant Eaton manufactures HD Transmissions for Class 8 Linehaul trucks; Class 8 "vocational" or "performance" trucks (such as cement mixers and dump trucks); and Class 8 "specialty" trucks (such as garbage trucks and fire trucks). Eaton has long been a monopolist in the market for HD Transmissions in North America. The jury in the ZF Meritor trial so found, (Ex. A), and Eaton did not challenge this finding on appeal.

4.     Eaton contracted with Original Equipment Manufacturers ("OEMs") who manufactured and sold HD Trucks equipped with Eaton Linehaul Transmissions, which were sold to Ryder and other consumers. Plaintiff alleges that Eaton's contracts with the OEMs, and other exclusionary conduct by Eaton, maintained and enhanced the monopoly power of Eaton in the market for transmissions used in HD Trucks (the "HD Transmissions market") (defined below) through, *inter alia*, the implementation of de facto exclusive dealing arrangements among Eaton and the OEMs. These de facto exclusive-dealing agreements effectively foreclosed the market for HD Transmissions from Eaton's competitors; eliminated Eaton's only viable competitor, ZF Meritor, a joint venture between Meritor Transmission Corporation ("Meritor") and ZF Friedrichshafen AG ("ZF"); and ensured that no other Eaton competitor could challenge Eaton's dominance.

5.     As a direct and proximate result of the de facto exclusive dealing arrangements and Eaton's other exclusionary conduct, Ryder and other purchasers of HD Trucks paid higher prices and received lower rebates for their HD Transmissions than would have been the case absent the anticompetitive conduct. These actions violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; and Chapter 501, Fla. Stat.

6.     OEMs purchase HD Transmissions from suppliers such as Eaton and then provide them as an option to HD Truck purchasers such as Ryder. In buying HD Trucks, truck purchasers choose various components from OEM "databooks" that contain these options. Eaton has long been the dominant supplier of HD Transmissions to the OEMs.

7.     However, in the 1990s, Eaton began to face increasing competition in the HD Transmissions market. Meritor had begun selling heavy duty 9-speed manual transmissions in 1989, and quickly grew its market share to over 16% by 1999. In 1999, to further improve its

- 3 -

competitive position, Meritor entered into a joint venture with ZF, a European manufacturer of HD Transmissions. This joint venture company, called ZF Meritor, used its expertise to develop and market the first fully automated, two-pedal manual transmission. The successful launch of this transmission increased ZF Meritor's sales and positioned it to expand its transmission offerings to serve a wider variety of heavy duty truck applications. Eaton was well aware of ZF Meritor's success and, according to a PowerPoint presentation from an internal meeting at Eaton, recognized that its own "Position is at Risk" because ZF Meritor had become "a Serious Competitor."

8.     During this same time, a consolidation caused the number of HD Truck OEMs to shrink to four: Freightliner (owned by Daimler Trucks North America LLC), Volvo Trucks North America (known as Volvo/Mack after Volvo's acquisition of Mack), PACCAR Inc. ("PACCAR"), and Navistar International Corporation ("International"). Shortly after this market consolidation in 2000, the market for HD Trucks experienced a significant downturn. As a result, for the following two years, participants in the market for HD Trucks faced substantially reduced sales. For example, Eaton lost nearly 65% of its market volume during this period. In a competitive market, Eaton would have responded to these market conditions by making efforts to increase its market share by producing HD Transmissions that were superior to, and competitively priced with, those of its main competitor, ZF Meritor. Indeed, prior to the anticompetitive conduct, James Sweetnam (Eaton's Senior Vice President from 1997 to 2009) testified that there was "tremendous price pressure" in the industry. All that was soon to change, however.

9.     Instead of responding to the market downturn in a competitive fashion, Eaton and the OEMs entered into a series of de facto exclusive dealing contracts of unprecedented scope and duration. These contracts, and the conduct of Eaton and the OEMs in forming, implementing, and

enforcing the anticompetitive terms of these contracts, foreclosed competitors such as ZF Meritor from over 90% of HD Transmission sales.

10.     Defendant Eaton's de facto exclusive dealing agreements with the OEMs effectively eliminated competition for HD Transmissions. This market foreclosure was the intended result. According to Eaton's Manager of OEM Sales and Marketing (John Buck), "*Eaton's strategy was to kill Meritor ZF's transmission business*." (Emphasis added.)

11.     As a result of the anticompetitive de facto exclusive dealing arrangements between Eaton and the OEMs, and Eaton's other exclusionary conduct, Plaintiff Ryder and other purchasers were harmed by, *inter alia*, paying supracompetitive prices for and receiving reduced rebates on thousands of Eaton Linehaul Transmissions, the largest-selling type of HD Transmissions. Plaintiff Ryder overpaid for Linehaul Transmissions because, absent the exclusionary conduct, as alleged herein, Meritor—which was a serious and growing competitive threat to Eaton in the sale of Linehaul Transmissions prior to the exclusionary scheme—would have continued to exist and grow as a competitive threat. Such competition would have resulted in lower prices and higher rebates for Linehaul Transmissions sold during the Affected Period (as defined below). Additionally, Plaintiff had fewer choices and suffered from a decrease in innovation.

12.     Following denial of class certification on December 6, 2017 for a proposed class seeking relief from this continuing anticompetitive conduct, Ryder brings this individual action under the federal antitrust laws and Florida statutes to assert its rights, obtain equitable relief and recover its losses as an aggrieved purchaser of HD Transmissions, including Eaton Linehaul Transmissions, during the Affected Period.

## II.     JURISDICTION AND VENUE

13.     Plaintiff brings this action to recover damages, including treble damages, cost of suit, and reasonable attorney's fees, as well as injunctive relief, arising from Defendant's violations

of Sections 1 & 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 & 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; and Chapter 501, Fla. Stat.

14.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337(a), and Section 4 of the Clayton Act, 15 U.S.C. § 15.

15.     This Court has subject matter jurisdiction over the Plaintiff's pendent state law claim pursuant to 28 U.S.C. § 1367, and pursuant to 28 U.S.C. § 1332. The Plaintiff's state law claim arises out of the same factual nucleus as the Plaintiff's federal law claims.

16.     Venue in this District is proper pursuant to 28 U.S.C. §1391(b)-(c), 15 U.S.C. § 15(a), and 15 U.S.C. § 22, in that Defendant transacts business, can be found, has an agent, resides, or is incorporated in this District.

17.     Eaton, on its own and through the OEMs, sells, markets, and distributes HD Transmissions throughout the United States, including this District, and delivers them across state lines. Eaton is engaged in, and its activities substantially affect, interstate commerce.

18.     Eaton did and does business in Florida, and the acts and practices alleged herein were committed in substantial part in Florida, causing injury to Ryder within Florida, including, without limitation:

> a.     Eaton paid rebates directly to Ryder in Florida for each Eaton Linehual Transmission that Ryder specified in vehicle purchasing agreements, under which Ryder took delivery in Florida of HD Trucks equipped with Eaton Linehual Transmissions.

b.    Eaton negotiated directly with Ryder in Florida for these rebates, and Eaton executed written contracts directly with Ryder in Florida on the terms of the rebates (the "Rebate Terms Agreement"). By their express written terms, the Rebate Terms Agreements covered "all units purchased under any Vehicle Purchasing Agreement" and set forth all essential terms relating to rebates, including: (a) the duration of each agreement, which ranged from a few months to a year or more; (b) the specific Eaton Transmission units for which Eaton agreed to pay rebates directly to Ryder; and (c) the amount of the rebate Eaton agreed to pay directly to Ryder on each specified unit. The Rebate Terms Agreement required Ryder to submit invoices directly to Eaton from Florida and required Eaton to pay the contractually specified rebate directly to Ryder in Florida within thirty days of Ryder's submission of the invoice.

c.    Eaton, in fact, paid thousands of rebate dollars under the Rebate Terms Agreements to Ryder in Florida, which Ryder accepted in Florida.

### III.    THE PARTIES

19.    Plaintiff Ryder is a corporation organized and existing under the State of Florida with its principal place of business in Miami, Florida. Plaintiff is a subsidiary of Ryder System, Inc. ("Ryder System"), a global leader in transportation and supply chain management solutions. As a public company whose stock is traded on the New York Stock Exchange, Ryder System reports its financial performance based on three principal business segments: (1) Fleet Management Solutions ("FMS"), which provides full service leasing, commercial rental, contract maintenance, and contract-related maintenance of trucks, tractors and trailers to customers principally in the U.S., Canada and the U.K.; (2) DTS, which provides vehicles and drivers as part

of a "dedicated transportation solution" in the U.S.; and (3) SCS, which provides comprehensive "supply chain solutions" including distribution and transportation services in North America and Asia. Ryder owns and manages HD Trucks that serve each of Ryder System's reportable business segments. During the Affected Period, Ryder purchased thousands of HD Trucks equipped with Eaton Linehaul Transmissions, negotiated directly with Eaton for rebates on each of those units, and received payment of those rebates directly from Eaton on each purchase. As a result of these purchases, Ryder sustained injury and was damaged by reason of the antitrust violations alleged in this Complaint.

20.     Defendant Eaton Corporation plc ("Eaton") is a corporation organized and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland and its North American headquarters in Cleveland, Ohio; prior to 2012, Eaton Corporation plc was known as Eaton Corporation, a corporation organized and existing under the laws of New Jersey. During all relevant times, Eaton manufactured, sold, and marketed HD Transmissions in the United States.

## IV.    FACTUAL ALLEGATIONS

### A.    Market Definition

21.     At all relevant times (and as more fully alleged below), Eaton had monopoly and/or market power in the market for HD Transmissions because it had the power to reduce the payment of rebates on and maintain the price of such transmissions at supracompetitive levels of profitably, without losing substantial sales. The market for HD Transmissions is made up of three principal submarkets: linehaul, vocational, and specialty. Eaton has monopoly power (substantial market power) in two of these submarkets, vocational and linehaul, in that it had the power to reduce the payment of rebates on, and maintain the price for, both types of transmissions at supracompetitive levels of profitability. Transmissions for linehaul, vocational, and specialty transmissions are not viable substitutes for each other.

22. In response to a small but significant, other-than-temporary increase in price and/or reduction of rebate from a competitive level, substitution by purchasers of HD Transmissions to other products would not be significant. Likewise, in response to a small but significant, other-than-temporary increase in price and/or reduction of rebate from a competitive level, (a) substitution by purchasers of HD Linehaul Transmissions to other products, including HD Vocational and HD Specialty Transmissions, would not be significant; and (b) substitution by purchasers of HD Vocational Transmissions to other products, including HD Linehaul and HD Specialty Transmissions, would not be significant.

23. HD Transmissions do not exhibit significant, positive cross-elasticity of demand with respect to price and/or rebates with any product other than HD Transmissions. Likewise, HD Linehaul Transmissions do not exhibit significant, positive cross-elasticity of demand with respect to price and/or rebates with any product other than HD Linehaul Transmissions, and HD Vocational Transmissions do not exhibit significant, positive cross-elasticity of demand with respect to price and/or rebates with any product other than HD Vocational Transmissions.

24. Because of the unique characteristics and specific applications for HD Transmissions, HD Transmissions are differentiated from all other products. Likewise, because of their differing characteristics and applications, HD Linehaul Transmissions are differentiated from all other products, including HD Vocational and Specialty Transmissions, and HD Vocational Transmissions are differentiated from HD Linehaul and Specialty Transmissions.

25. Eaton need only control HD Transmissions, and no other products, to raise and/or maintain the price of and/or rebates on HD Transmissions profitably at supracompetitive levels. Likewise, Eaton need only control HD Linehaul Transmissions, and no other products, to maintain the price and profitability of HD Linehaul Transmissions at supracompetitive levels, and need only

control HD Vocational Transmissions, and no other products, to maintain HD Vocational Transmissions prices and profitability at supracompetitive levels.

26.     Eaton sold HD Linehaul and HD Vocational Transmissions at prices, and paid rebates at levels, well in excess of marginal costs and competitive prices and enjoyed healthy profit margins.

27.     Eaton had, and exercised, the power to exclude competition for HD Linehaul and HD Vocational Transmissions.

28.     Eaton, at all relevant times, enjoyed high barriers to entry with respect to HD Linehaul and HD Vocational Transmissions.

29.     To the extent that defining a relevant product market is necessary in this case, the relevant product market is HD Transmissions. And to the extent that defining relevant product submarkets is necessary in this case, the relevant product submarkets are (a) HD Linehaul Transmissions and (b) HD Vocational Transmissions.

30.     The geographic market for HD Transmissions is the United States (for purposes of this paragraph, referred to as "U.S."). Because of the assorted applications for which HD Trucks are used, the wide assortment of U.S. truck configurations, the extensive network of highways and expressways in the U.S, along with load restrictions in other regions of the world compared to the U.S. (meaning that Class 8 vehicles in the U.S. tend to be heavier and longer and transmissions therefore tend to be larger), and other factors, transmissions used in Class 8 vehicles in the U.S. are different from, and not reasonably interchangeable with, transmissions used in Class 8 vehicles in other regions of the world. Suppliers of U.S. HD Transmissions are likely to locate their primary manufacturing and assembly facilities, and marketing, distribution, and service personnel, in the

U.S. As such, HD Truck purchasers cannot practicably turn to other regions of the world for transmissions to use in U.S. Class 8 vehicles.

31.     As alleged more fully below, at all relevant times, Eaton held at least a 90% share in the relevant product market, and each of the relevant product submarkets, in the United States.

**B.     Background:  The Heavy Duty Trucking Industry, Heavy Duty Transmissions and Heavy Duty Trucks**

32.     A transmission or gearbox sends power from a vehicle's engine to its drive wheels. When equipped with the proper transmission, the engine produces sufficient torque (i.e., the force used to turn the engine crankshaft) to accelerate and maintain a vehicle's speed. Torque is measured in pound-feet ("lb-ft"), and a transmission's capacity to accommodate torque is referred to as its "torque rating."

33.     Transmissions use various gear ratios (called "gears" or "speeds") to manage the torque and speed of the vehicle. The number of gears and gearing characteristics vary by vehicle and engine type.

34.     The switching of gears may be performed manually (by the driver) or automatically, depending on the type of transmission. To change gears using a conventional stick-shift manual transmission, the driver typically must depress the clutch and move a shift lever to the desired gear. In a vehicle with a conventional automatic transmission, the driver of the vehicle does not have to change gears; the transmission uses hydraulics to select the gears. A vehicle with a conventional manual transmission has three pedals (accelerator, brake, and clutch), while a vehicle with a conventional automatic transmission has just two pedals (accelerator and brake).

35.     "Automated manuals" are manual transmissions with clutches that have been automated with actuators and electronic controls to perform operations normally performed by the driver. A fully automated manual transmission has two pedals (accelerator and brake) and an

electronically controlled clutch. The driver can drive in either automated or manual mode. In manual mode, the driver uses a stick-shift to initiate shifts between speeds, and the computer operates the clutch or controls the engine to allow for clutch-less gear shifting.

36.     There are eight recognized classes of vehicles which employ different transmissions. Class 8 trucks are the heaviest, weighing 33,001 pounds or more. Unlike Class 8 Transmissions, the transmissions used in Class 1 to Class 7 vehicles are not built to withstand the high torque generated by the diesel engines that power heavy duty trucks, and are therefore not reasonably substitutable with them.

37.     In fiscal year 2005, over 325,000 new Class 8 Transmissions were sold, and revenues from these sales exceeded $1 billion. As Eaton's Sr. Vice President (James Sweetnam) testified, the business was worth between $1 and $2.5 billion.

38.     Class 8 trucks in the United States are distinct from heavy duty trucks in geographic regions outside of the United States. Truck buyers in the United States prefer heavier, longer trucks with higher horsepower and torque capable of hauling bigger loads. Additionally, truck purchasing in the United States is unique as compared to truck purchasing in other geographic regions because customers in the United States are able to specify which components they prefer in their Class 8 trucks.

39.     HD Transmissions for vehicles used in materially different applications are not good substitutes for one another. HD Transmissions can be divided into three product categories: linehaul, vocational, and specialty. Purchasers of HD Transmissions intend to use them for a particular vehicle (i.e., linehaul, vocational, or specialty) and are unlikely to substitute a transmission intended for a different vehicle type.

40.     As relevant to the Affected Period, approximately 70% of HD Transmissions were used in linehaul trucks ("HD Linehaul Transmissions"). Linehaul trucks are designed to carry freight long distances (at least 30 miles between stops), travel 60,000 miles or more a year, and operate mostly on highways or other paved surfaces. Linehaul trucks are used to haul, among others, box trailers, curtain siders, refrigerated trailers, tankers, flat beds, lowboys, and car-carrying trailers. Linehaul trucks have historically used manual 9- and 10-speed transmissions with an accelerator, brake, and clutch pedal and torque ratings generally ranging from 1,450 lb-ft to 1,650 lb-ft. More recently, automated manual transmissions with torque ratings similar to 9- and 10-speed manual transmissions have become more popular with linehaul operators. In response to a small but significant, other-than-temporary increase in price from a competitive level, substitution by purchasers of HD Linehaul Transmissions to other types of HD Transmissions would not be significant.

41.     As relevant to the Affected Period, about 26% of HD Transmissions were used in vocational trucks. HD Transmissions used for vocational applications ("HD Vocational Transmissions") are found in heavy duty trucks operating in rugged performance environments. For purposes of this Complaint, HD Vocational Transmissions include: (a) extreme-duty, 13- and 18-speed transmissions, with torque ratings typically ranging from 1,650 lb-ft to 1,850 lb-ft but sometimes exceeding 2,000 lb-ft; and (b) on- and off-road "Low-Low" and 15-speed transmissions, with gearing designed to provide efficient cruising and creeping (i.e., extremely slow) speed versatility. HD Vocational Transmissions with high torque ratings are often used in heavy duty trucks transporting equipment or materials weighing more than 140,000 pounds. Vocational Low-Low and similar transmissions are predominately found in heavy duty construction vehicles, which need great versatility to operate in on- and off-road environments. In

response to a small but significant, other-than-temporary increase in price from a competitive level, substitution by purchasers of HD Vocational Transmissions to other types of HD Transmissions would not be significant.

42. As relevant to the Affected Period, the remainder of HD Transmissions, about 4%, were sold for specialty trucks. HD Transmissions used for specialty applications ("HD Specialty Transmissions") are primarily used in "stop and start" vehicles, such as garbage, fire, and delivery trucks. Nearly all specialty transmissions are automatic transmissions. The torque ratings for HD Specialty Transmissions are generally less than 1,500 lb-ft. Unlike tractor trailers, most heavy duty vehicles containing specialty transmissions are straight trucks (i.e., the cab, chassis, and body comprise a single unit). Historically, customers have paid three-to-five times more for a HD specialty automatic transmission than they would for a comparable manual or automated manual transmission. In response to a small but significant, other-than-temporary increase in price from a competitive level, substitution by purchasers of HD Specialty Transmissions to other types of HD Transmissions would not be significant.

43. The OEMs purchase HD Transmissions and incorporate those transmissions into the HD Trucks they sell to truck buyers. The OEMs manufacture and sell HD Trucks directly to large truck fleet operators, such as Ryder, and through dealers. Dealers sell to owner operators and, on occasion, to fleets. Like most truck buyers (fleet or otherwise), Ryder specified the brand of transmission and other components to be used in the HD Trucks it purchased.

44. Ryder and other HD Truck buyers have the ability to select HD Truck components, including the HD Transmissions, from OEM catalogues called "data books." Data books list the alternative component choices, and include a price for each option relative to the "standard" or "preferred" offerings. The "standard" offering is the component that is provided to the customer

unless the customer expressly designates another supplier's product, while the "preferred" or "preferentially-priced" offering is the lowest priced component in data book among comparable products. Data book positioning is a form of advertising, and standard or preferred positioning generally means that customers are more likely to purchase that supplier's components. Although customers may, and sometimes do, request components that are not published in a data book, doing so is often cumbersome and increases the cost of the component. Thus, data book positioning is essential in the industry.

45.     The barriers to entry into the HD Transmissions market are high. Entrants and existing competitors face high sunk and fixed costs to bring competitive products to market. They have little-to-no ability to license the intellectual property needed for transmission design and development, and have to spend substantial amounts of money to validate the reliability and other attributes of their products, which can take upwards of a year or more. They would also have to make intensive and sustained investments in transmission marketing, warranty programs, demonstrations, sales, and service if they hope to persuade customers to purchase or switch to their transmissions. Finally, entrants would need sustained sales of transmissions in order to earn enough market share to be able to recoup these substantial entry costs.

**C.     Eaton Possesses, and at All Relevant Times Possessed, a Monopoly in HD Transmissions**

46.     Beginning with its purchase of the Fuller Manufacturing Company in 1958, Eaton has been the dominant and most widely known heavy duty manual transmission manufacturer in the United States and, indeed, all of North America.

47.     By the late 1980s, Eaton held at least an 80% market share and the standard position in the databooks for nearly every truck model at each of the OEMs in the submarkets for HD

Linehaul and HD Vocational Transmissions. It has described itself as "solidly entrenched" in the marketplace.

48.     Based on sales of all HD Transmissions (linehaul, vocational, and specialty combined), Eaton has (or at relevant times, had) at least 90% of the market. The other HD Transmissions manufacturers for the United States market are Allison Transmission (a division of General Motors) and Volvo/Mack, which produces transmissions for its own line of trucks.

49.     Eaton has had monopoly power in the HD Linehaul Transmissions submarket throughout the Affected Period, and by 2010 Eaton possessed upwards of 90% of this market.

50.     Eaton has had monopoly power in the HD Vocational Transmissions submarket throughout the Affected Period, and by 2010 possessed upwards of 90% of this market.

### D.     Consolidation of Heavy Duty Truck OEMs

51.     The landscape of the HD Truck market changed dramatically between 1996 and the early 2000s. In 1996, seven OEMs manufactured HD Trucks, including Freightliner, PACCAR, International (via Navistar), Volvo, Mack, Sterling, and Western Star. Over the next six years, following a series of acquisitions, that number was reduced to four: Freightliner, PACCAR, International, and Volvo/Mack. These acquisitions included Freightliner's 1997 purchase of the heavy duty truck division of Ford Motor Company, soon to be labeled the Sterling brand; Freightliner's 2000 purchase of Western Star trucks; and Volvo's 2000 acquisition of Mack for $1.71 billion in shares.

### E.     ZF Meritor Competes with Eaton

52.     In the late 1990s, a competitor in the HD Transmissions market—Meritor—grew at a sufficient pace that, left unchecked, would have eroded Eaton's dominant position. Meritor (through its predecessor, Rockwell International Corporation), first began to manufacture and sell Class 8 Linehaul Transmissions in 1989.

53.     Meritor started out supplying 9- and 10-speed manual transmissions for HD Linehaul Trucks. By 1992, Meritor was able to gain roughly 14% of sales in the HD Linehaul Transmissions submarket. Meritor achieved additional growth after it obtained "standard" position on certain Freightliner truck models and availability in databooks at all the OEMs.

54.     In 1996, Meritor developed an engine synchronized shift ("ESS") system, which automatically synchronized engine revolutions to road speed. The innovation made manual shifting easier, essentially eliminating the need to use the clutch except for stopping and starting. In the same period, Eaton offered some transmission automation through its Top-2 and AutoSelect products. The Eaton and Meritor technologies represented the first generation of HD transmission automation in North America. Meritor's introduction of ESS benefited consumers by, among other things, bringing competition to these automated products.

55.     By 1999, Meritor's share of transmission sales for HD Linehaul Transmissions had surpassed 20%. In an attempt to further enhance its position in the market, Meritor entered into the joint venture with ZF to form ZF Meritor in June 1999. Meritor and ZF each had a 50% interest in the venture, including the venture's profits and losses.

56.     ZF brought to the venture its expertise in transmission technology. ZF's product line in Europe included automatics and fully automated manual heavy duty transmissions. No single manufacturer offered such a range of products in North America, much less the United States. The combination of ZF and Meritor's marketing and service teams, distribution and manufacturing capabilities, and North American presence created a formidable competitor to Eaton.

57.     In August 1999, building upon Meritor's relationship with Freightliner, ZF Meritor entered into a non-exclusive, short-term supply agreement with Freightliner, the largest HD Truck

OEM. At Freightliner, ZF Meritor secured "standard" position on, among other models, Freightliner's Class 8 Century and Sterling's "Aeromax" truck models. The agreement did not require Freightliner to remove Eaton transmissions from the Freightliner databook or charge customers a price penalty for selecting optional Eaton transmissions. The agreement was to run through 2001 and could be extended by the parties. ZF Meritor expected to achieve a high volume of transmission sales on Freightliner trucks.

58.     At the other OEMs, ZF Meritor transmissions were listed in the databooks as a competitively priced option.

59.     One purpose of the ZF Meritor joint venture was to adapt ZF's two-pedal automated mechanical transmission, ASTronic, which was used exclusively in Europe, for the North American market. The redesign and testing took 18 months, and ZF Meritor introduced the adapted ASTronic model into the North American market in 2001 under the new name FreedomLine. FreedomLine was the first two-pedal automated mechanical transmission to be sold in North America. When FreedomLine was released, Eaton projected that automated mechanical transmissions would account for 30–50% of the market for all HD transmission sales by 2004 or 2005.

60.     Based on ZF's "Astronic" automated manual transmission, the FreedomLine beat Eaton's two-pedal offering (the UltraShift) to market by nearly three years. Eaton did not produce a two-pedal automated mechanical transmission at the time, and would not fully release one until 2004.

61.     The FreedomLine met with positive feedback from the industry and customers. In 2000, the Truck Writers of North America awarded FreedomLine the Technical Achievement

Award, given annually to the truck component that "best exemplifies engineering excellence and broad practicality for use in the trucking industry."

62.     The FreedomLine represented the third generation in automated transmission technology for HD Trucks in North America. First- and second-generation technology required the use of a manual clutch, thereby necessitating a three-pedal configuration. The FreedomLine did not require a clutch pedal; it operated with only accelerator and brake pedals.

63.     The superior efficiencies and value of the third-generation technology were numerous, ranging from improved fuel economy to enhanced driver safety, instruction, and retention, to less drive train wear, a quieter ride, and higher resale values.

64.     ZF Meritor's release of the FreedomLine put Eaton's dominant market position at risk. Eaton did not have a two-pedal offering, and predictions in the heavy duty truck industry were that automated manual transmissions, including third-generation technology, would gain significant share among Class 8 Transmission users. Automated manual transmissions did, in fact, gain significant market share: by 2005, share had reached 12% to 15%, with Eaton predicting additional growth of 1% to 2% per year.

65.     The emergence of ZF Meritor, with its "standard" positioning at Freightliner, its optional, competitively priced position at other OEMs, its existing customer base upon which to build, and its introduction of the FreedomLine transmission (particularly in the absence of a two-pedal Eaton transmission) created a substantial competitive threat to Eaton's market dominance.

**F.     Eaton's Long–Term Agreements**

66.     In late 1999 through early 2000, the trucking industry experienced a 40–50% decline in demand for new heavy-duty trucks. Shortly thereafter, Eaton entered into new long-term agreements ("LTAs") with each OEM. Although long-term supply contracts were not uncommon in the industry, and were also utilized by Meritor in the 1990s, Eaton's new LTAs were

unprecedented in terms of their length and coverage of the market. Eaton signed LTAs with every OEM, and each LTA was for a term of at least five years. Although the LTAs' terms varied somewhat, the key provisions were similar. Each LTA included a conditional rebate provision, under which an OEM would only receive rebates if it purchased a specified percentage of its requirements from Eaton. Eaton's LTA with Freightliner, the largest OEM, provided for rebates if Freightliner purchased 92% or more of its requirements from Eaton. Under Eaton's LTA with International, Eaton agreed to make an up-front payment of $2.5 million, and any additional rebates were conditioned on International purchasing 87% to 97.5% of its requirements from Eaton. The PACCAR LTA provided for an up-front payment of $1 million, and conditioned rebates on PACCAR meeting a 90% to 95% market-share penetration target. Finally, Eaton's LTA with Volvo provided for discounts if Volvo reached a market-share penetration level of 70% to 78%. (the lower penetration level taking into account the fact that Volvo manufactured its own HD Transmissions). The LTAs were not true requirements contracts because they did not expressly require the OEMs to purchase a specified percentage of their needs from Eaton. However, the Freightliner and Volvo LTAs gave Eaton the right to terminate the agreements if the share penetration goals were not met. Additionally, if an OEM did not meet its market-share penetration target for one year, Eaton could require repayment of all contractual savings.

67.    Each LTA also required the OEM to publish Eaton as the standard offering in its data book, and under two of the four LTAs, the OEM was required to remove competitors' products from its data book entirely. Freightliner agreed to exclusively publish Eaton transmissions in its data books through 2002, but reserved the right to publish ZF Meritor's FreedomLine through the life of the agreement. In 2002, Freightliner and Eaton revised the LTA to allow Freightliner to publish other competitors' transmissions, but the revised LTA provided that Eaton had the right to

"renegotiate the rebate schedule" if Freightliner chose to publish a competitor's transmission. Subsequently, Freightliner agreed to a request by Eaton to remove FreedomLine from all of its data books. Eaton's LTA with International also required that International list exclusively Eaton transmissions in its electronic data book. International did, however, publish ZF Meritor's manual transmissions in its printed data book. The Volvo and PACCAR LTAs did not require that Eaton products be the exclusive offering, but did require that Eaton products be listed as the preferred offering. Both Volvo and PACCAR continued to list ZF Meritor's products in their data books. In the 1990s, Meritor's products were listed in all OEM component data books, and in some cases, had preferred positioning.

68.     The LTAs also required the OEMs to "preferential price" Eaton transmissions against competitors' equivalent transmissions. Eaton claims that it sought preferential pricing to ensure that its low prices were passed on to truck buyers. However, there were no express requirements in the LTAs that savings be passed on to truck buyers (i.e., that Eaton's prices be reduced) and in fact "preferential pricing" was achieved by both lowering the prices of Eaton's products and raising the prices of competitors' products. According to an email sent by Eaton to Freightliner, the Freightliner LTA required that ZF Meritor's products be priced at a $200 premium over equivalent Eaton products. Likewise, International agreed to an "artificial[ ] penal[ty]" of $150 on all of ZF Meritor's transmissions as of early 2003, and PACCAR imposed a penalty on customers who chose ZF Meritor's products.

### G.     Foreclosure of Competition under the LTAs and ZF Meritor's Exit from the Market

69.     During the life of the LTAs, the OEMs worked with Eaton to develop a strategy to combat ZF Meritor's growth. On Eaton's urging, the OEMs imposed additional price penalties on customers that selected ZF Meritor products, "force fed" Eaton products to customers, and sought

to persuade truck fleets using ZF Meritor transmissions to shift to Eaton transmissions. These actions, the LTAs, and Eaton's additional exclusionary conduct foreclosed competition while preserving and increasing Eaton's market dominance.

### Foreclosure at Freightliner

70.     Eaton dislodged ZF Meritor's supply agreement with Freightliner by, among other acts, guaranteeing Freightliner millions in annual rebates and other incentives if Freightliner purchased 92% of its total linehaul and vocational transmission needs from Eaton. Freightliner's rebate package included sizeable rebates on Eaton's vocational, premium-priced transmissions (*e.g.,* 13 and 18 speeds), for which Eaton was the sole manufacturer. Unless it qualified for the rebates, Freightliner would pay substantially more for these transmissions. Given its mix of vocational and linehaul transmission needs, Freightliner would have to purchase Eaton 9 and 10 speeds, to the exclusion of ZF Meritor' s competing transmissions, to achieve 92% penetration. Thus, Eaton linked rebates on vocational transmissions for which it faced no meaningful competition (including vocational transmissions critical to Freightliner's subsidiary Sterling) to Freightliner' s purchase of linehaul transmissions for which Eaton faced competition from ZF Meritor.

71.     Eaton also demanded that Freightliner displace ZF Meritor from standard position in its data book and bestow that valuable status on Eaton. Further, Eaton demanded that ZF Meritor's transmissions be listed at a penalty in the Freightliner data book (*i.e.,* at prices above comparable Eaton transmissions), and excluded from the data book beginning in late 2001 or early 2002. Freightliner expressed reservations about this latter demand because the exclusive listing would increase the cost of processing and administering orders for unpublished transmissions.

There was no procompetitive justification for Eaton's demands; Eaton's only aspiration was to drive ZF Meritor out of the market.

72.     ZF Meritor attempted to save the Freightliner business by offering discounts and other incentives on its linehaul transmissions. Although it was an efficient producer of linehaul transmissions, it could not fully compensate Freightliner for rebates on vocational transmissions Freightliner would have to forego if it contracted with ZF Meritor.

73.     Eaton and Freightliner consummated their new relationship in or around late 2000. The purpose and effect of the Eaton/Freightliner contract, whether through the use of penetration incentives, bundled rebates, or Eaton's non-negotiable demand for standard position and displacement of ZF Meritor transmissions, was to ensure that Eaton secured all of Freightliner' s transmission business, to ZF Meritor' s exclusion.

74.     Further, to assure that ZF Meritor would starve in the market before having and opportunity to partner with Freightliner again, Eaton obtained a long-term contract with Freightliner, which would carry the agreement into at least 2006.

75.     Freightliner's acceptance of Eaton's demands harmed competition and injured consumers. Among other things, removal of ZF Meritor transmissions from the Freightliner data book and the imposition of price penalties on ZF Meritor transmissions impaired consumer access to those products.

76.     In 2000, Freightliner awarded ZF Meritor its Master of Quality Award. In 2002, Freightliner again awarded ZF Meritor that award; no Eaton facility received a similar award from Freightliner. Despite ZF Meritor's dedication to quality and Freightliner's ready recognition of that quality, ZF Meritor could not surmount the restrictive and exclusionary nature of the Eaton/Freightliner agreement.

- 23 -

77.     As a direct and foreseeable result of the Eaton/Freightliner anticompetitive agreement and Eaton's other exclusionary acts, including enforcement of the terms of the contract, ZF Meritor's sales to Freightliner and its affiliates declined substantially. Shortly before consummation of the Eaton/Freightliner contract, for the fiscal fourth quarter of 2000, ZF Meritor's penetration at Freightliner and Sterling, respectively, stood at around 23% and 17%. By the end of fiscal year 2005, Meritor's share of transmission sales to Freightliner and Sterling, respectively, had fallen to roughly 4% and 3%.

### Foreclosure at International

78.     Eaton entered into a long-term de facto exclusive contract with International, effective in or around early 2001. Under the contract, International would receive maximum incentives only after Eaton's combined linehaul and vocational sales penetration at International reached 87%, and possibly as high as 95% by the last year of the agreement. To obtain rebates on vocational transmissions for which Eaton faced no meaningful competition International would have to purchase Eaton transmissions (mainly 9 and 10 speed manual transmissions), which competed directly with ZF Meritor's transmissions.

79.     The agreement also required International to exclude ZF Meritor on new truck models from International's data book, and prohibit International's Diamond Spec warranty from covering new truck models equipped with ZF Meritor, rather than Eaton, transmissions. Further, Eaton received standard position on International's HD Linehaul and HD Vocational Transmissions. There was no procompetitive justification for excluding ZF Meritor; Eaton acted solely to bar and foreclose ZF Meritor from markets for Class 8 Transmissions.

80.     Eaton's exclusionary practices at International expanded in 2002. According to International, Eaton offered International "a compelling incentive to increase their sales at your

[ZF Meritor's] expense." If International accepted the Eaton proposal, "it would undertake every effort to cease ordering your [ZF Meritor] product … switching current and future orders" to Eaton. Further, in 2006, Eaton executed another contract with International, contractually obligating International to remove the FreedomLine from its data book and exclusively market Eaton's automated manual transmissions.

81.    Eaton's exclusionary conduct at International impaired consumer access to ZF Meritor transmissions and penalized downstream truck fleets and other customers who preferred ZF Meritor's transmissions.

82.    As a direct and foreseeable result of the Eaton/International anticompetitive agreement and Eaton's other exclusionary acts, ZF Meritor's penetration at International declined. Around the consummation of the Eaton/International contract, for the fiscal fourth quarter of 2000, ZF Meritor's penetration at International stood around 13%. By the end of fiscal year 2005, Meritor's share of transmission sales to International had faded to 2%. As a result, for new International truck models, Meritor transmissions would not be engineered into the vehicle platform - the transmissions would not be available on those vehicles, even as an unpublished option.

**Foreclosure at Paccar**

83.    ZF Meritor expected its relationship with PACAAR to grow with the introduction of the FreedomLine. Eaton, however, modified and extended its supply agreement with Paccar to prevent ZF Meritor growth at Paccar. The long-term agreement, a five-year deal, withheld from Paccar maximum transmission rebates unless Eaton's share of sales to Paccar of linehaul and vocational transmissions (and other components) reached 95%. The FreedomLine was not excluded from Paccar's penetration calculation: purchases of the FreedomLine would count

against Paccar reaching its penetration goals, thereby decreasing its incentive to sell the new technology. Dampening Paccar's purchases of the FreedomLine held particular value to Eaton since Paccar would be the first OEM (through Peterbilt) to release the FreedomLine to downstream customers.

84.     As a direct and foreseeable result of the Eaton/Paccar anticompetitive agreements and Eaton's other exclusionary acts, ZF Meritor's share of transmission sales at Paccar consistently languished around 5% and fell to less than 1% in fiscal year 2005. In early 2005, Paccar's Peterbilt announced ZF Meritor/Meritor transmissions would no longer be available on new truck orders.

### Foreclosure at Volvo/Mack

85.     Having locked Freightliner, International and Paccar in long-term de facto exclusive contracts, Eaton locked ZF Meritor out of the remaining portion of the market by entering into a similar exclusive arrangement with the only other OEM, Volvo/Mack.

86.     In the spring and summer of 2002, ZF Meritor attempted to form a commercial partnership with Volvo/Mack for the manufacture, marketing, and sale of linehaul and vocational transmissions. This was a ZF Meritor priority given Eaton's agreements with each of the other OEMs. ZF Meritor offered substantial price reductions, year-over-year cost downs (*i.e.,* price decreases), and the opportunity for Volvo/Mack to obtain a full line of private brand transmissions, including vocational transmissions.

87.     In the fall of 2002, Eaton and Volvo/Mack entered into a five-year contract, expiring at the earliest in 2007. The agreement contained HD Linehaul and HD Vocational Transmission penetration incentives that essentially withheld from Volvo/Mack maximum rebates or price reductions if ZF Meritor's sales reached 15% of Volvo/Mack's linehaul and vocational transmission purchases. Eaton further diminished ZF Meritor's opportunity for sales at

Volvo/Mack by requiring Volvo/Mack to price ZF Meritor transmissions at a penalty to Eaton transmissions. Eaton also was made standard on all of Volvo/Mack's Class 8 linehaul trucks and Volvo's Class 8 vocational vehicles. Eaton offered Volvo/Mack additional price reductions on transmissions if Volvo/Mack excluded ZF Meritor transmissions from its data book.

88.     Eaton's acts of exclusion through Volvo/Mack lacked any procompetitive justification and injured consumers. Customers seeking ZF Meritor transmissions to be installed in Volvo/Mack trucks were dissuaded from doing so by, among other things, the threat of monetary penalties.

89.     As a direct and foreseeable result of the Eaton/Volvo/Mack anticompetitive agreement and Eaton's other exclusionary acts, ZF Meritor's penetration at Volvo/Mack declined. ZF Meritor's/Meritor's share of transmission sales to Volvo and Mack fell from an estimated 24% and 6%, respectively, in the fiscal fourth quarter of 2002, around the time of the Eaton-Volvo/Mack transaction, to approximately 11% and 2%, respectively, by the end of fiscal year 2005.

**H.     Eaton's De Facto Exclusive Dealing Arrangements, and other Exclusionary Conduct, Force ZF Meritor to Exit the HD Transmission Market**

90.     Easton's de facto exclusive dealing arrangements with the OEMs were designed so that the OEMs would qualify for rebates, and thus share in the monopoly rents, provided they diverted both current and future purchasers of competing transmissions, most notably ZF Meritor transmissions, to Eaton. Eaton and the OEMs  employed a variety of strategies to accomplish this goal including agreeing to have the OEMs:

    a.     eliminate ZF Meritor from databook listings;

    b.     reduce the residual values to be paid for trucks sold with ZF Meritor transmissions;

c.   offer larger concessions off of total truck prices for trucks equipped with Eaton transmissions;

d.   refuse to provide financing to customers that specified ZF Meritor transmissions;

e.   inform customers that if they wanted delivery by specified dates, the customers would have to change orders from ZF Meritor transmissions to Eaton transmissions;

f.   decline to hold "build slots" for truck buyers if they selected other than Eaton transmissions;

g.   market Eaton's three-pedal automated manual transmission as essentially comparable to ZF Meritor's technologically superior two-pedal FreedomLine;

h.   impose pricing penalties upon heavy duty truck purchasers not justified by changing costs on competing Class 8 Transmissions including ZF Meritor transmissions;

i.   exclude trucks containing transmissions other than Eaton transmissions from warranty programs;

j.   notify customers that ZF Meritor transmissions were not available, even though they were available; and/or

k.   delay and disrupt the release and sale of Meritor's FreedomLine transmission.

91.     The Eaton-precipitated anticompetitive conduct obstructed ZF Meritor's pull-through marketing efforts and materially increased artificially inflated prices of Eaton transmissions, to the detriment of ZF Meritor and truck purchasers, including Ryder.

92.     Eaton also used these and other exclusionary acts to obstruct Meritor's entry into the market for HD Vocational Transmissions. Given the significance of economies of scale in production of Class 8 Transmissions, and the substantial fixed and sunk costs associated with the research, development, and introduction of new transmission technology and products, Meritor required sales opportunities and ample investment or partnerships in order to enter into the vocational market. The anticompetitive practices alleged herein, however, deprived Meritor and ZF Meritor of the sales opportunities, investment, or partnerships necessary to enter this market. Eaton and the OEMs entered into de facto exclusive contracts exceeding five years in duration and covering linehaul and vocational transmissions that served to lock ZF Meritor out of the vocational market.

93.     The anticompetitive conduct—including LTAs between Eaton and the OEMs, employment of bundled rebates, lucrative share penetration incentives, databook and other exclusions, and punitive pricing on Meritor and ZF Meritor transmissions—had the practical effect of precluding ZF Meritor from selling HD Linehaul Transmissions and HD Vocational Transmissions to the OEMs. One OEM simply told ZF Meritor that it could not do business with ZF Meritor because of the OEM's contract with Eaton.

94.     The OEMs were aware of the intended effect of the de facto exclusive dealing arrangements. As articulated in an email from Greg Sharp, the Freightliner purchasing agent, "We have already killed Meritor's transmission business. It is just a matter of time now before they close the doors."

95.     By 2003, ZF Meritor determined that it was limited by the de facto exclusive dealing arrangements and Eaton's other exclusionary conduct to no more than 8% of the market, far less than the 30% that it had projected at the beginning of the joint venture. ZF Meritor officials concluded that the company could not remain viable with a market share below 10% and therefore decided to dissolve the joint venture. After ZF Meritor's departure, Meritor remained a supplier of HD transmissions and became a sales agent for ZF to ensure continued customer access to the FreedomLine. However, Meritor's market share dropped to 4% by the end of fiscal year 2005, and Meritor exited the business in 2007.

**I.      Eaton's De Facto Exclusive Dealing Arrangements and Other Exclusionary Conduct Injured Competition in the Market for Heavy Duty Transmissions**

96.     The foregoing de facto exclusive dealing arrangements, and Eaton's other exclusionary conduct,  has directly and proximately harmed competition by limiting consumer choice, eliminating competitive checks on pricing, eliminating competitive stimulation of rebates, suppressing innovation, and foreclosing the market for HD Transmissions in the United States. These acts have served to exclude Meritor and ZF Meritor from the market for linehaul transmissions, and Meritor and ZF Meritor have been deterred from undertaking investments in technology and products that would have threatened Eaton's monopoly in the market for vocational transmissions. If Meritor and ZF Meritor had not been foreclosed, competition would have intensified, and purchasers would have benefited from lower prices and higher rebates for Linehaul Transmissions. Instead, as a result of the anticompetitive conduct, purchasers have been monetarily penalized and excluded from warranty programs if they purchased Meritor or ZF Meritor transmissions, and have also been deprived of fair and timely access to ZF Meritor's advanced transmission technology, including, without limitation, Meritor's ESS transmission system and North America's first two-pedal, fully automated manual transmissions.

97.     The foregoing anticompetitive de facto exclusive dealing arrangements, and Eaton's other exclusionary conduct, has caused antitrust injury to Ryder and other truck purchasers by, *inter alia*, foreclosing competition for HD Transmissions, artificially inflating the prices of HD Transmissions, artificially reducing rebates on HD Transmissions, suppressing innovation, and foreclosing competitive choices.

98.     Prior to the de facto exclusive dealing arrangements, in order to compete with Meritor, Eaton used payments and other monetary incentives to market its HD Transmissions to Ryder and other purchasers. These payments and incentives were paid by Eaton directly to Ryder and other purchasers and were competitive measures used by Eaton to combat Meritor's increasing market share. However, once the de facto exclusive dealing arrangements and Eaton's other exclusionary conduct foreclosed Meritor from the market, Meritor was no longer a competitive threat. As a result, Eaton eliminated or reduced some incentives to purchasers, including Ryder. In other cases, Eaton held rebates at historical levels but charged supracompetive prices it could not have charged if it had not eliminated competition.

99.     In contrast to the harm that the de facto exclusive dealing arrangements and Eaton's other exclusionary conduct  has caused Ryder and other truck purchasers, Eaton's business, which relies heavily on its United States transmission sales, has amassed record profits. Since the start of the anticompetitive conduct alleged herein, Eaton's operating profits from its sales of Class 8 Transmissions increased from $90 million in 2002, to a high of $453 million in 2005, and $315 million in 2008. At the same time, Eaton's operating margins increased from 7.7% in 2002, to a high of 19.8% in 2005, and 14% in 2008.

100.     The foregoing anticompetitive conduct and the resultant injuries occurred throughout the Affected Period and continue to this date.

**J.        Eaton's Antitrust Violations Caused Injury to Ryder's Business and Property**

101.    As a fleet purchaser, Ryder purchased thousands of Class 8 Linehaul trucks each year. Both before and after ZF Meritor's exit from the marketplace in 2007, Eaton paid rebates directly to Ryder for each Eaton Transmission that Ryder specified in a vehicle purchasing agreement. Ryder negotiated directly with Eaton for these rebates, and Ryder contracted directly with Eaton in writing on the terms of the rebates (the "Rebate Terms Agreement"). By their express written terms, the Rebate Terms Agreements covered "all units purchased under any Vehicle Purchasing Agreement" and set forth all essential terms relating to rebates, including: (a) the duration of each agreement, which ranged from a few months to a year or more; (b) the specific Eaton Transmission units for which Eaton agreed to pay rebates directly to Ryder; and (c) the amount of the rebate Eaton agreed to pay directly to Ryder on each specified unit. The Rebate Terms Agreement required Ryder to submit invoices directly to Eaton and required Eaton to pay the contractually specified rebate directly to Ryder within thirty days of Ryder's submission of the invoice.

102.    Ryder and Eaton were the only parties to the Rebate Terms Agreements. Neither the OEMs nor any other third party had any involvement in Ryder's and Eaton's negotiation of, execution of, or performance under the Rebate Terms Agreements.

103.    Prior to ZF Meritor's exit from the marketplace in 2007, Eaton paid substantial rebates directly to Ryder on manual HD Linehaul Transmissions covered by the Rebate Terms Agreements. After ZF Meritor's exit from the marketplace in 2007, the rebates Eaton paid directly to Ryder decreased dramatically. For example:

        a.    From 2005 to 2008, the rebates Eaton paid directly to Ryder on manual 9- and 10-speed Eaton Transmission Model No. FRO-14210C (torque rating of 1,400 lbs.) decreased by approximately $300 per unit. By 2010, the

decrease was $350 per unit, and by agreement dated July 11, 2011, the decrease had reached $400 per unit, which by the express terms of the 2011 agreement remained in effect on purchases at least through December 31, 2014.

b.  From 2005 to 2008, the rebates Eaton paid directly to Ryder on manual 9- and 10-speed Eaton Transmission Model No. FR-15210B (torque rating of 1,500 lbs.) decreased by approximately $250 per unit. By 2010, the decrease was $300 per unit, and by agreement dated July 11, 2011, the decrease had reached $350 per unit, which by the express terms of the 2011 agreement remained in effect on purchases at least through December 31, 2014.

c.  From 2005 to 2008, the rebates Eaton paid directly to Ryder on manual 9- and 10-speed Eaton Transmission Model No. FRO-16210C TRCTR (torque rating of 1,600 lbs.) decreased by approximately $250 per unit. By agreement dated July 11, 2011, the decrease was $300 per unit, which by the express terms of the 2011 agreement remained in effect on purchases at least through December 31, 2014.

d.  From 2005 to 2008, the rebates Eaton paid directly to Ryder on manual 9- and 10-speed Eaton Transmission Model No. FRO-17210C (torque rating of 1,700 lbs.) decreased by approximately $200 per unit. By agreement dated July 11, 2011, the decrease was $250 per unit, which by the express terms of the 2011 agreement remained in effect on purchases at least through December 31, 2014.

104.    Eaton's reduction of rebates extended to all models (manual and automated) of Eaton Linehaul Transmissions covered by the Rebate Terms Agreements, and Eaton's reduction of rebates continues to this day, causing substantial financial injury to Ryder.

105.    Separate and distinct from the reduction of rebates it paid directly to Ryder under the Rebate Terms Agreements, Eaton's antitrust violations caused additional injury to Ryder's business and property in the form of "passed on" overcharges. By excluding ZF Meritor from the market, Eaton was able to sell HD Linehaul Transmissions to the OEMs at supracompetitive prices. As alleged more fully above, Eaton shared monopoly rents by paying rebates and making other payments to OEMs, which more than neutralized any wholesale overcharge to the OEM, but the OEMs nonetheless passed on the wholesale "overcharge" to Ryder and other purchasers of linehaul trucks.

106.    Eaton's unlawful conduct also discouraged and delayed innovation, which further caused injury to Ryder's business and property. For example, in 2015, Ryder System became an industry leader by offering a "female-friendly" vehicle lease package that includes specs designed to meet the needs of female drivers. Ryder worked with various OEMs and the Women in Trucking Association (WIT), a non-profit organization established to encourage the employment of women in the trucking industry, on the vehicle design, which includes fifteen unique specifications better suited to women drivers. Among these female-friendly specifications was the availability of automated transmissions. ZF Meritor was a leader in automated Class 8 Linehaul transmissions, and Eaton's unlawful and exclusionary conduct delayed the availability of cost-efficient automated transmissions and therefore delayed Ryder's implementation of programs such as its female friendly vehicle lease package.

**K.     Fraudulent Concealment, *American Pipe* Tolling, and Continuing Violations**

107.    Plaintiff Ryder exercised reasonable due diligence to discover but had no knowledge of, did not discover, and could not have discovered through the exercise of reasonable due diligence, the anticompetitive de facto exclusive dealing arrangements, Eaton's other exclusionary and unlawful conduct alleged herein, or the existence of the causes of action alleged herein, at any time prior to October 5, 2006, when Meritor filed an antitrust lawsuit against Eaton in the District of Delaware. Eaton and the OEMs did not disclose the existence or nature of their anticompetitive arrangement and conduct to Plaintiff Ryder or any other purchaser, and they affirmatively concealed the nature of the anticompetitive arrangement through fraudulent and self-concealing means. The actions of Eaton and the OEMs (e.g., ensuring that Meritor transmissions did not appear in databooks, falsely informing customers that Meritor transmissions were not available, and falsely informing customers that if they wanted delivery by specified dates, the customers would have to change orders from ZF Meritor transmissions to Eaton transmissions) were false, fraudulent and self-concealing in that they pushed customers away from Meritor transmissions for reasons that had no basis in truth or fair competition, and such representations were made with the intent to deceive Ryder and other purchasers and to eliminate competition, specifically Meritor transmissions, from the HD Transmissions market. The secretive nature of the anticompetitive arrangement was enforced and carried out through confidentiality provisions in the LTAs, which concealed the anticompetitive nature of the unlawful conduct of Eaton and the OEMs from Plaintiff Ryder and other purchasers.

108.    As a result of Eaton's fraudulent concealment of the anticompetitive de facto exclusive dealing arrangements and Eaton's additional exclusionary conduct, Plaintiff Ryder asserts the tolling of the applicable statute of limitations affecting Plaintiff's right of action.

109.    In addition to fraudulent concealment, Plaintiff Ryder asserts continuing tolling of the statute of limitations based upon the putative class action filed against Eaton.

a.    Ryder was a member of the putative class as defined in *Mark S. Wallach, et al, v. Eaton Corporation, et al.*, Civ. No. 10–260–SLR (D. Del.), filed on March 31, 2010. On December 6, 2017, the district court denied class certification, finding a lack of common proof, but the court allowed individual claims to proceed. Plaintiff Ryder has acted diligently and reasonably in pursuing its right to assert an individual claim following the denial of class certification. The individual claims asserted in this Complaint (both federal and state) involve the same evidence, memories, and witnesses as were involved in the putative class action. The complaint in *Wallach* challenged the conduct that is alleged herein and was sufficient to alert Eaton to preserve all evidence regarding that conduct.

b.    Ryder was a member of the putative class as defined in *Avenerius, et al v. Eaton Corp. et al.*, Case No. 10-CV-2539 EFM/JPO (D. Del.), filed on October 4, 2010. The district court denied class certification, finding a lack of common proof, and also dismissed the plaintiffs' individual claims. On February 9, 2017 the Third Circuit affirmed the denial of class certification but vacated the dismissal of the individual claims. Principles of equitable tolling require the additional tolling of the statute of limitations at least through the date of the Third Circuit's reversal of the district court's erroneous dismissal of the individual claims. Given the common nucleus of facts, evidence, and witness, and given the overlapping theory of liability and damages alleged in the direct purchaser (*Wallach*) and indirect purchaser actions, and given the continuing

- 36 -

nature of the anticompetitive conduct as alleged herein, principles of equitable tolling require further tolling of Ryder's state law claim through the district court's denial of certification in the direct purchaser action (December 6, 2017). Plaintiff Ryder has acted diligently and reasonably in pursuing its right to assert an individual claim under state law.

110.     In addition, the illegal conduct and the harm Eaton caused in violation of federal and state law, as alleged above and in the Counts below, occurred continuously throughout the Affected Period and continues to the present day. Since May 21, 2014, Ryder has purchased thousands of HD Trucks equipped with Eaton Linehaul Transmissions. As a result of Eaton's anticompetitive conduct, Eaton earned supracompetitive profits from both the artificially reduced rebates and artificially increased prices on those Eaton Linehaul Transmissions.

111.     Accordingly, Plaintiff Ryder asserts claims for its purchase of HD Trucks equipped with Eaton Linehaul Transmissions after October 5, 2002 and continuing to the present (the Affected Period).

## CAUSES OF ACTION

### COUNT I

**MONOPOLIZATION OF THE HD TRANSMISSIONS MARKET**
**IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**(REDUCTION OF REBATES ONLY)**

112.     Plaintiff incorporates by reference paragraphs 1 through 111.

113.     HD Transmissions constitute a relevant product market, and the United States is the relevant geographic market.

114.     Eaton possessed, and currently possesses, monopoly power in the market for HD Transmissions, as well as the HD Linehaul Transmissions and HD Vocational Transmissions submarkets. Barriers to entry and expansion by existing firms are high in this market and these

submarkets. Eaton, with approximately 90% share of the HD Transmissions market and the relevant submarkets, has the power to control price and exclude competition for HD Transmissions in this market and the relevant submarkets.

115.    Eaton willfully and wrongfully obtained and/or maintained its monopoly in the HD Transmissions market and the relevant submarkets by engaging in the exclusionary, anticompetitive conduct set forth in the preceding paragraphs of this Complaint.

116.    The anticompetitive effects of Eaton's conduct far outweigh any purported non-pretextual, procompetitive justifications, and, in any event, Eaton's conduct was not reasonably necessary to achieve the same.

117.    As a direct, foreseeable, and proximate result of Eaton's exclusionary, anticompetitive conduct, Plaintiff Ryder and other direct purchasers have been harmed and competition has been impaired by, without limitation, depriving Plaintiff and other direct purchasers of fair and timely access to innovative Class 8 truck transmission technology and higher rebates on HD Linehaul Transmissions.

118.    As a result of Eaton's exclusionary and anticompetitive conduct, Plaintiff Ryder has been injured in its business or property. Ryder has been injured by Eaton's reduction of rebates paid directly to Ryder in exchange for Ryder's direct promise to Eaton to spec Eaton Linehaul Transmissions on Ryder's HD Linehaul vehicles in the United States. Such injury is of the type the antitrust laws were designed to prevent, is separate and distinct from any injury in the form of an overcharge passed on by the OEMs to their customers, and flows directly to Ryder from Eaton's unlawful conduct.

119.    To the extent that Eaton's violations have deprived the industry of efficiencies and innovation, Plaintiff has no adequate remedy at law, and Eaton's unlawful conduct will continue unless enjoined.

## COUNT II

## USE OF EXCLUSIONARY CONTRACTS TO SUBSTANTIALLY LESSEN COMPETITION IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14 (REDUCTION OF REBATES ONLY)

120.    Plaintiff incorporates by reference paragraphs 1 through 111.

121.    Eaton and the OEMs entered into contracts for the purchase of goods (HD Transmissions) that, by their agreed-upon terms, extended duration, and cumulative practical effect, prevented the OEMs from purchasing Meritor's and ZF Meritor's transmissions.

122.    The OEMs purchased transmissions from Eaton, consistent with their respective de facto exclusive arrangements with Eaton, which excluded Meritor and ZF Meritor from 90% or more of the sales opportunities for HD Transmissions and substantially lessened competition or created an Eaton monopoly in the HD Linehaul and HD Vocational submarkets in the United States.

123.    The anticompetitive effects of Eaton's conduct far outweigh any purported non-pretextual, procompetitive justifications, and, in any event, Eaton's conduct was not reasonably necessary to achieve the same.

124.    As a direct, foreseeable, and proximate result, Eaton has harmed Plaintiff Ryder and competition by, without limitation, depriving Plaintiff and other purchasers of fair and timely access to innovative HD Transmission technology (including Meritor and ZF Meritor manual and automated manual transmissions) and higher HD Transmission rebates, which healthy and fair competition would have provided.

125.     In the alternative, Eaton's de facto exclusive arrangement with each OEM was an exclusionary contract to substantially lessen trade, each of which created an independent violation of Section 3 of the Sherman Act, 15 U.S.C. § 14.

126.     As a result of Eaton's exclusionary and anticompetitive conduct, Plaintiff Ryder has been injured in its business or property. Ryder has been injured by Eaton's reduction of rebates paid directly to Ryder in exchange for Ryder's direct promise to Eaton to spec Eaton HD Transmissions on Ryder's HD Linehaul vehicles in the United States. Such injury is of the type the antitrust laws were designed to prevent, is separate and distinct from any injury in the form of an overcharge passed on by the OEMs to their customers, and flows directly to Ryder from Eaton's unlawful conduct.

127.     To the extent that Eaton's violations have deprived the industry of efficiencies and innovation, Plaintiff has no adequate remedy at law, and Eaton's unlawful conduct will continue unless enjoined.

## COUNT III

### UNLAWFUL RESTRAINT OF TRADE IN
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
### (REDUCTION OF REBATES ONLY)

128.     Plaintiff incorporates by reference paragraphs 1 through 111.

129.     Eaton and the OEMs contracted among themselves to eliminate Meritor and ZF Meritor from competing in the HD Linehaul and HD Vocational Transmissions submarkets in the United States. These actions are in violation of 15 U.S.C. § 1 in that they served to unreasonably restrain trade and to maintain prices for Class 8 Linehaul Transmissions sold in the United States at supracompetitive levels by foreclosing the sale of Meritor and ZF Meritor Class 8 Transmissions in the United States market.

130.     As a result of Eaton's exclusionary and anticompetitive conduct, Plaintiff Ryder has been injured in its business or property. Ryder has been injured by Eaton's reduction of rebates paid directly to Ryder in exchange for Ryder's direct promise to Eaton to spec Eaton HD Transmissions on Ryder's HD Linehaul vehicles in the United States. Such injury is of the type the antitrust laws were designed to prevent, is separate and distinct from any injury in the form of an overcharge passed on by the OEMs to their customers, and flows directly to Ryder from Eaton's unlawful conduct.

131.     To the extent that Eaton's violations have deprived the industry of efficiencies and innovation, Plaintiff has no adequate remedy at law, and Eaton's unlawful conduct will continue unless enjoined.

## COUNT IV

### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, CHAPTER 501, FLORIDA STATUTES

132.     Plaintiff incorporates by reference paragraphs 1 through 111.

133.     Eaton's conduct was, among other things, an antitrust violation based on unlawful monopolization, an agreement in restraint of trade and de facto exclusive dealing in violation of 15 U.S.C. §§ 1, 2 and 14. For these reasons, among others, Eaton's conduct was knowingly unfair and deceptive, injurious to the public, and an unfair method of competition in violation of § 501.204(1), Fla. Stat.

134.     Eaton's FDUTPA violation caused actual damage to Plaintiff in the form of (i) Eaton's reduction of rebates paid directly to Ryder on Eaton HD Transmissions, and (ii) unlawful overcharges on Eaton HD Transmissions that OEMs passed on to Ryder on each Eaton HD Transmission installed in HD Trucks purchased by Ryder.

135.    Eaton's FDUTPA violation maintained prices of HD Transmissions at artificial levels and resulted in harm to Plaintiff because it resulted in Ryder paying higher prices for HD Truck Transmissions than Ryder would have paid in the absence of the violation. HD Truck buyers, including Ryder, select a particular HD Transmission for the HD Truck purchased. Moreover, when a HD Transmission is purchased for inclusion in Ryder's HD Truck, the transmission is a distinct, physically-discrete element of the HD Truck that is identifiable by a specific, discrete part or model number that permits tracing. Thus, a HD Transmissions follows a traceable physical chain from Eaton to Ryder. Tracing can help show that changes in the prices paid by the OEMs for HD Transmissions affect prices paid by Ryder for HD Transmissions or, more broadly, HD Trucks.

136.    As a result, the inflated prices of HD Transmissions resulting from Eaton's FDUTPA violation have been passed on to Ryder. The HD Transmission makes up a substantial component of the cost of an HD Truck. The retail price of a HD Truck is determined, in significant part, by the cost of the HD Transmission it contains.

137.    Microeconomic theory teaches that the only situations in which precisely zero pass through would be expected are if an industry faced a perfectly elastic demand for its product (*i.e.*, the price was fixed, with demand dropping to zero with an infinitesimal price increase, and expanding infinitely if price were to drop infinitesimally), or if supply was perfectly inelastic (*i.e.*, if even a very large increase in price for a product was incapable of stimulating additional supply). Both of these possibilities are generally considered implausible by economists, and are not even mentioned in some discussions of the subject. Either scenario is at odds with the nature of the HD Truck industry. Thus, Ryder has been forced to pay supra-competitive prices for Class 8 Truck Transmission and, more broadly, Class 8 trucks, as a result of Eaton's FDUTPA violation.

138.    To the extent that Eaton's violations have deprived the industry of efficiencies and innovation, Plaintiff has no adequate remedy at law, and Eaton's unlawful conduct will continue unless enjoined.

## JURY TRIAL DEMAND

1.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Ryder demands a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests entry of judgment:

(a) declaring, ordering, and adjudging that the aforesaid agreements and other exclusionary conduct unreasonably restrain trade and are illegal under Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2; under Section 3 of the Clayton Act, 15 U.S.C. §14; and under Chapter 501, Fla. Stat.

(b) permanently enjoining Defendant Eaton (including its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns) from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the agreements in which it is alleged to have engaged, or any other agreement having a similar purpose or effect in violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; and Chapter 501, Fla. Stat.

(c) Awarding Plaintiff its full monetary damages to be proven at trial;

(d) Awarding Plaintiff treble its monetary damages, pursuant to 15 U.S.C. § 15;

(e) Awarding Plaintiff pre- and post-judgment interest on its damages;

(f) Awarding Plaintiff the costs of this action and reasonable attorneys' fees pursuant to 15 U .S .C. § 15 and Chapter 501, Fla. Stat.; and

(g) Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated:  May 22, 2018

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By: */s/ Stuart H. Singer*
    STUART H. SINGER
    (Florida Bar No. 377325)
    JAMES GRIPPANDO
    (Florida Bar No. 383015)
    401 East Las Olas Boulevard, Suite 1200
    Fort Lauderdale, FL  33301
    Telephone:  (954) 356-0011
    Facsimile:   (954) 356-0022
    Email:  ssinger@bsfllp.com
    Email:  jgrippando@bsfllp.com
    Email:  ftleserve@bsfllp.com